JOURNAL ENTRY AND OPINION *Page 3 
{¶ 1} Defendant-appellant Reginald Wilmore appeals from his conviction on one count of aggravated murder, one count of attempted murder, and one count of having a weapon while under disability. The charges stemmed from Wilmore's complicity with codefendant Aaron Addison in carrying out a revenge shooting. Wilmore argues that (1) there was insufficient evidence to establish his complicity, (2) the verdict was against the manifest weight of the evidence, (3) the state engaged in misconduct by alluding to his failure to put on a defense, (4) defense counsel performed ineffectively by failing to request a jury instruction on the lesser included offense of involuntary manslaughter, and (5) the court imposed an excessive sentence for aggravated murder. We conclude that none of the assigned errors have merit and affirm.
 {¶ 2} The victim's death was the culmination of a series of events that began two days before the shooting. On a Saturday night, Wilmore appeared at the door of Latrice Cromwell, a Cleveland Metropolitan Housing Authority ("CMHA") complex resident. By her own admission, Cromwell had been operating a convenience store of sorts out of her apartment in violation of CMHA rules. The evidence showed that in addition to selling snack items, soft drinks and beer, she and her boyfriend, Carlos Holder, also sold crack cocaine and marijuana.
 {¶ 3} A friend of Cromwell's, who was also the victim's girlfriend, answered the door and saw Wilmore and a companion. Wilmore wanted to buy beer, but *Page 4 
Cromwell did not know him and said that she would not serve him. The girlfriend closed the door on Wilmore. Angered, he began kicking at the door. Cromwell opened the door and told him that she would call the police if he did not stop kicking the door. Wilmore then punched her, knocking a cell phone from her hand. The two began fighting and Wilmore knocked Cromwell to the ground. The girlfriend joined the fight by jumping on Wilmore's back. Cromwell picked up her cell phone and called the CMHA police. When Wilmore heard Cromwell make the call, he left the premises.
 {¶ 4} As the two women waited on the outside porch for the police to arrive, they saw Wilmore and two other men approach. One of the men carried a baseball bat. Cromwell mocked Wilmore for needing to bring friends along to fight her. The men left, and Wilmore returned alone sometime later. He apologized and asked if Cromwell had found a key. Cromwell had pocketed a key that had fallen from Wilmore during the fight, but she refused to give him the key. She told him that she had called the CMHA police and intended to prosecute him. Incensed, Wilmore told Cromwell that "it wasn't over with" and walked away.
 {¶ 5} The girlfriend testified that Cromwell remained angry, pacing back and forth and saying that "she ain't no sucker, and she about to call somebody down here to handle this." Cromwell called the CMHA police and told them not to come over to her apartment. She then called a person named "T-Mack" whom the girlfriend concluded could "handle whatever [Cromwell] wanted him to handle." T-Mack *Page 5 
did not show up, but she did receive a call from Holder. Holder and the victim, Charles Cromwell (Cromwell's cousin), later arrived at the apartment. They were soon joined by Holder's cousin. After hearing what happened, Holder called two of his friends and asked them to come over. After some conversation, four of the men decided to go looking for Wilmore — the victim stayed behind with Cromwell and the girlfriend. Two of them carried guns. The four men did not say where they were going.
 {¶ 6} The four men came upon a small group of people that included codefendant Addison, whom they knew by the nickname "Wax." Holder told these people that they were looking for Wilmore. Wilmore was not present, so Holder told the others that these people were not the ones who fought with Cromwell. A conversation between the two groups escalated into an argument. Holder stated that "[a]nd they just somehow — I don't know, they just started shooting at each other." Holder ran from the scene. A bystander testified that he had been in the area, speaking with Addison and Addison's girlfriend, when Holder and some other men "rolled up on us and started shooting."
 {¶ 7} Cromwell and her friend said that they heard shooting just a few minutes after the four men left. Cromwell told the friend, "they got him [Wilmore]." Holder returned to the apartment and told the women that the others had shot at the wrong people. The victim became upset because these people knew where Holder lived and would come back to the apartment. Holder himself told the women "he *Page 6 
had a feeling something was going to happen." He told the women to gather the children and that they would go across the street to his aunt's house.
 {¶ 8} They stayed at the aunt's house for a few hours, and then returned to the apartment to collect some things before spending the day at a relative's house "until things cool down[.]" After spending the day with the relative, they returned to Cromwell's apartment sometime between 9 and 10 p.m. Holder went to his aunt's apartment to get his gun.
 {¶ 9} The bystander who had been shot at the previous night by Holder's group testified that about an hour or so before the murder, he had been with Wilmore and Addison. The bystander left, but another witness who lived near the shooting site testified that at a time shortly before the shooting occurred, she had been on her way to buy drugs when she saw Wilmore talking with two other men. She said that Wilmore was holding what looked like a single-barrel shotgun and she assumed that "something was about to go down." Unsuccessful in finding a dealer, she was walking back along the same route and saw Wilmore standing with four or five other men, one of whom was Addison. She knew Addison because he drove a purple convertible. Wilmore still carried the shotgun, but the witness did not see anyone else carrying a weapon. She said that the men were all dressed in black and were wearing hooded sweatshirts, even though it was August. When she walked by them, she heard Wilmore say, "let's do it." Fearful that some shooting might occur, the *Page 7 
witness kept walking. She then heard the sound of weapons discharging, including a "pump sound" that she attributed to a shotgun.
 {¶ 10} At around midnight, Cromwell saw Addison standing outside the apartment, holding a shotgun. Addison told her to take her daughter and boyfriend and leave the house. The girlfriend was in one of the bedrooms when the victim angrily entered the bedroom and said that someone outside on the porch had called him names. She then heard Cromwell and Holder arguing about a "confrontation." Cromwell told Holder that she did not want any "drama" at her house.
 {¶ 11} An upstairs neighbor overheard Cromwell talking to Addison and another man. She heard them tell Cromwell to get her boyfriend and kids out of the house. They then walked away. The neighbor said the two men each carried long, black guns. She then went down to Cromwell's apartment and said that all of the occupants of the apartment should go to her apartment for safety. They roused the victim, who had been asleep on the floor, and asked him to shut the storm door to the porch before going upstairs. When the victim approached the storm door, shots were fired. One of those shots hit the victim in the head.
 {¶ 12} The police recovered five shell casings from a 9mm firearm outside the apartment, all of which were fired from the same weapon. No shotgun shells were recovered, but the police found a number of "defects" in the porch screen door and the brick wall surrounding the screen door. A police expert testified these defects *Page 8 
were consistent with a multiple pellet shotgun round. Other defects existed in the window frame that were also consistent with a shot from a shotgun shell.
 {¶ 13} The coroner testified that the bullet which struck the victim had traveled through his brain in a slightly downward trajectory. This fact was potentially problematic because the floor level of the apartment was elevated several feet above the ground level where the shell casings were recovered. The coroner said the trajectory of the bullet did not rule out the theory that it had been fired from outside the apartment.
 I {¶ 14} In his first assignment of error, Wilmore complains that the evidence was legally insufficient to find that he acted as the principle offender or in complicity in the commission of a crime. He maintains that the evidence merely showed that he had been present at the time of the shooting but had not taken any overt act in furtherance of the shooting.
 {¶ 15} When reviewing a claim that there is insufficient evidence to support a conviction, we view the evidence in a light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1981), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 16} As charged in this case, the essential elements of aggravated murder are set forth in R.C. 2903.01(A), which states "[n]o person shall purposely, and with *Page 9 
prior calculation and design, cause the death of another ***." "Prior calculation and design" is not defined by the Revised Code. In State v.Cotton (1978), 56 Ohio St.2d 8, paragraph three of the syllabus states:
 {¶ 17} "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified."
 {¶ 18} A rational trier of fact could find that the state presented evidence which, when viewed most favorably to the state, established the essential elements of aggravated murder. Just minutes before the murder occurred, witnesses placed Wilmore in Addison's company. Wilmore not only carried a shotgun, but he was dressed entirely in black and wore a hooded sweatshirt. He was heard to say, "let's do it," and moments later a witness heard the sound of a shotgun being pumped and then fired. The police confirmed that some of the damage to the apartment exterior had been caused by shotgun pellets.
 {¶ 19} Wilmore's primary argument is that the state failed to offer any evidence that actually placed him on the scene when the shooting occurred. Although none of the witnesses actually saw Wilmore fire into the apartment, he was seen in Addison's company just moments before the murder, holding a shotgun. He not only stated "let's do it," but testimony from witnesses attested to the sound of a *Page 10 
shotgun being fired, and physical evidence confirmed that shotgun pellets had been fired against the apartment building, including the window near the point where the victim had been shot. This evidence was sufficient circumstantial evidence to allow a rational jury to find that Wilmore fired the shotgun.
 {¶ 20} The victim's death by a bullet, as opposed to shotgun pellets, was of no consequence to Wilmore's guilt. A rational trier of fact could have found that Wilmore aided and abetted Addison in carrying out the murders by aiding and abetting Addison in the shooting.
 {¶ 21} R.C. 2923.03(A)(2) states that no person, "acting with the kind of culpability required for the commission of an offense," shall "[a]id or abet another in committing the offense[.]" A person aids or abets in a crime when the evidence shows that "the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v. Johnson (2001), 93 Ohio St.3d 240,2001-Ohio-1336, syllabus. Criminal intent "can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." In re T.K., 109 Ohio St.3d 512,2006-Ohio-3056, ¶ 13, citing Johnson, 93 Ohio St.3d at 245.
 {¶ 22} Viewed in a light most favorable to the state, the evidence showed that Wilmore had been in Addison's presence just before the murder. Moreover, his conduct showed his intent to aid and abet. By dressing similarly to Addision, *Page 11 
carrying a gun and urging Addision to "do it," Wilmore showed his criminal intent to carry out the shooting and purposely, by prior calculation and design, caused the victim's death.
 {¶ 23} The victim's lack of connection to the underlying dispute between Cromwell and Wilmore suggested that he had not been an intended target for Wilmore and Addison. The state therefore proceeded on a theory of transferred intent, under which "an offender who intentionally acts to harm someone but ends up accidentally harming another is criminally liable as if the offender had intended to harm the actual victim." See In re T.K., 109 Ohio St.3d at para: 15. Wilmore argues that the theory of transferred intent is inapplicable in this case because he had no quarrel with either Cromwell or her boyfriend and hence no reason to shoot anyone.
 {¶ 24} This argument fails to consider that Wilmore had been aggrieved by both Cromwell and her boyfriend. Wilmore not only had a physical altercation with Cromwell, but when he returned to her apartment seeking the return of his house key, he was refused and was told that she was calling the police. Incensed, Wilmore told her that "it wasn't over with" and left. That same day, Cromwell's boyfriend and his companions set out to confront Wilmore. Even though shots were mistakenly fired at Addison and those with him at the time, the jury could have concluded that Wilmore would have known that Holder was really after him. Wilmore's subsequent actions against Cromwell and her boyfriend could then be explained either as support for Addison, or as a preemptive strike against Cromwell and her boyfriend in *Page 12 
the event they were to come after him again. Under either scenario, a rational trier of fact could have found Wilmore guilty under a theory of transferred intent.
 II {¶ 25} Wilmore next argues that the jury's verdict was against the manifest weight of the evidence because there were too many contradictions by Cromwell, and the witness who saw him with Addison just prior to the murder was inherently unbelievable. He claims that there were so many issues of credibility with these two witnesses that only a wayward jury could have found him guilty.
 {¶ 26} We determine whether a verdict or judgment of conviction is against the manifest weight of the evidence by weighing all of the reasonable inferences, considering the credibility of witnesses and, in considering conflicts in the evidence, determining whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. See State v. Thompkins (1997), 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, we remain mindful that the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. This deference means that the trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." State v. Antill (1964), 176 Ohio St. 61, 67.
 {¶ 27} Wilmore mainly assails Cromwell's credibility, arguing that she gave inconsistent and unbelievable testimony at trial. He maintains, for example, that *Page 13 
Cromwell lied to the police about selling drugs from her apartment, erroneously placed Holder in the apartment when she fought with Wilmore, and gave unbelievable testimony that she fought in the hallway with Wilmore for 50 minutes.
 {¶ 28} Cromwell admittedly had credibility issues, nearly all of which stemmed from her desire to hide her "convenience" store business from the authorities. These and other issues of credibility did not, however, contradict the basic elements of her testimony relating to the shooting, all of which were corroborated by other witnesses. For example, regardless of whether Cromwell accurately stated the length of time she fought with Wilmore out in the hallway, a fight did occur. Whether Cromwell's boyfriend had been present during that fight was immaterial given that independent evidence showed that Holder did, in any event, set out to find and confront Wilmore for fighting with Cromwell.
 {¶ 29} The witness who saw Wilmore with Addison just prior to the shooting admitted that she was a drug addict and had been out walking that night in search of drugs. Despite this admission, she testified that she had not been able to locate drugs and was returning to her house when she saw Wilmore and Addison in the street. She knew both men, being able to identify Addison's distinctive purple-colored convertible. After seeing Wilmore with a shotgun, her belief that "something was about to go down" was corroborated not only by evidence that other witnesses heard a shotgun being fired just moments later, but by the recovery of shotgun pellets from the building facade. *Page 14 
 {¶ 30} Wilmore's argument rests mainly on the lack of any evidence actually placing him outside Cromwell's apartment when the shooting started. To credit this point, the jury would have to discredit testimony that had been independently corroborated from other sources. Likewise, Wilmore's theory that another person had accompanied Addison finds no support in the record. It would require the jury to believe that Wilmore said to the group of men, "let's do it," then hand his gun to another person and walk in a direction opposite from the group. The jury did not lose its way by believing the state's witnesses.
 III {¶ 31} In his third assignment of error, Wilmore complains about several instances in which he claims the state improperly commented on his failure to present a defense. He argues that these comments violated his right to remain silent.
 A {¶ 32} In State v. Davis, 116 Ohio St.3d 404, 2008-Ohio-2, para: 228, the supreme court stated, "[t]he test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights. State v. Smith (1984),14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. The touchstone of the analysis Is the fairness of the trial, not the culpability of the prosecutor.' Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,71 L.Ed.2d 78." *Page 15 
 B {¶ 33} Wilmore first complains about a comment the assistant prosecuting attorney made to the upstairs neighbor in response to a sustained objection. The upstair neighbor had been asked if she was aware of what transpired between Cromwell and Wilmore the day before the murder. The upstairs neighbor stated, "[d]id I know about it? She was starting to tell me, but — I don't know what happened. She was starting to tell me what happened, but she didn't finish telling me. She said something about — [.]" The court sustained a defense objection and the assistant prosecuting attorney told the witness, "[t]hey don't want you to say what she said." The defense asked if it could approach the bench, but the court said "[t]here is no need to approach." Wilmore maintains that the state's comment suggested that the defense objected because it wanted to hide something from the jury.
 {¶ 34} We find no basis for Wilmore's assertion that the state implied that the defense wished to "hide" testimony from the jury. The objection was obviously made on hearsay grounds. As is common in criminal trials, the state tried to explain to the witness why the objection had been sustained and how her testimony was limited — hence, the remark that the witness could not say what another person told her. The state's use of the word "they" in this context referred to both the defense and the trial judge: the defense when it made the objection and the trial judge when *Page 16 
she sustained the objection. This remark does not rise to the level of improper comment.
 C {¶ 35} The next alleged instance of prosecutorial misconduct occurred during the state's closing argument and concerned the state's comment that Wilmore did not offer an expert witness to rebut the state's experts.
 {¶ 36} At trial, the defense proceeded on two, interrelated theories. First, it maintained that the elevated nature of the apartment made it impossible for bullets fired from ground-level outside the apartment to have struck the victim with a downward trajectory. Second, it maintained that the victim had been struck by a bullet fired by Cromwell's boyfriend from inside the apartment.
 {¶ 37} The state countered Wilmore's theory concerning the trajectory of the bullet by noting that there were bullet termination points in the very back of the apartment. The trajectory of these bullets showed that they had been fired from the outside to the inside, not from the inside to the outside. The state also refuted the defense theory that Cromwell's boyfriend, Holder, had killed the victim. It offered expert testimony showing that Holder's gun could not have fired the bullet that killed the victim because Holder's gun used a different caliber bullet than the one recovered from the victim. Ballistics testing also showed that markings on bullets test-fired from Holder's gun did not match the markings found on bullets that were recovered on the scene. *Page 17 
 {¶ 38} During the defense closing argument, Wilmore questioned how shots fired from outside the apartment could have struck the victim in a downward manner. In response, the state noted that:
 {¶ 39} "Now, you can figure out here by looking at the evidence how exactly [the victim] was shot to death in this case. All right. Mr. Shaughnessy [defense counsel] gets up here, and he says it's impossible that this could have happened the way the prosecution says. Oh, really Mr. Shaughnessy. What evidence are you talking about? What defense expert came in here to refute the State's expert?
 {¶ 40} "MR. FALLON: Objection.
 {¶ 41} "MR. SHAUGHNESSY: Objection.
 {¶ 42} "THE COURT: Sustained.
 {¶ 43} "MR. KOSKO: None. None.
 {¶ 44} "MR. FALLON: Objection.
 {¶ 45} "THE COURT: Sustained.
 {¶ 46} "MR. FALLON: What State's expert?
 {¶ 47} "MR. KOSKO: The State's witnesses, experts were not refuted in this case by any evidence. No one testified in opposition to them.
 {¶ 48} "MR. SHAUGHNESSY: Objection.
 {¶ 49} "THE COURT: Sustained.
 {¶ 50} "MR. FALLON: Can we approach, Judge? *Page 18 
 {¶ 51} "THE COURT: Ladies and Gentlemen, you are
instructed that the defense does not have any burden of proof in this case, and is not required to present any evidence."
 {¶ 52} Read in context, the state's remarks noted that Wilmore failed to present expert testimony that would contradict the state's ballistic's witness. Defense counsel told the jury in an opening statement that he believed that a bullet from Holder's gun killed the victim. The prosecutor simply commented on the defense's failure to offer evidence in support of its theory of the case. See State v.Clemons (1998), 82 Ohio St.3d 438, 452, 1998-Ohio-406; State v.Williams (1986), 23 Ohio St.3d 16, 19-20, 23. In making this comment, the state did not implicate Wilmore's right to remain silent. SeeState v. Wheatt (Jan. 16, 1997), Cuyahoga App. No. 70197 (comments on Wheatt's failure to challenge the state's expert held not tantamount to commenting on his failure to testify and present evidence).
 {¶ 53} Moreover, even if the remarks had risen to the level of misconduct, we could not find that they affected the fairness of trial because, although unnecessary, the court gave a prompt instruction that cautioned the jury that Wilmore was not required to present evidence. We presume that the jury followed the court's instruction, so the state's remark would not have been prejudicial. See State v. Garner (1995),74 Ohio St.3d 49, 59, 1995-Ohio-168.
 D *Page 19 {¶ 54} Wilmore next challenges several statements made by the state which assailed the defense's tactic of cross-examining some of the state's witnesses to denigrate their character, and by implication, their credibility. For example, the assistant prosecuting attorney noted that defense counsel did not conduct a substantive cross-examination of Cromwell because the defense only wanted "to trash [her] so we can get up and argue, hey, this lady is a piece of dirt, don't believe her, beyond a reasonable doubt." Later, the assistant prosecuting attorney referenced the state witness who overheard Wilmore say "let's do it." He argued that the defense did not substantively challenge her testimony in any respect:
 {¶ 55} "No, we don't want to ask those questions. We want to ask about, you're a prostitute. You use drugs, alcohol. You got all kinds of issues. *** Do you think she wanted to come in here and be called a crack addict and a prostitute and an alcoholic? And you're worthless, and you're in rehab for 30 days, big deal. You think she wanted that? No."
 {¶ 56} The state is afforded wide latitude in closing arguments.State v. Benge, 75 Ohio St.3d 136, 141, 1996-Ohio-227. That latitude is sometimes characterized as allowing the state to strike "hard blows," but not "foul blows." State v. Smith (1984), 14 Ohio St.3d 13, 14.
 {¶ 57} We conclude that these remarks did not fall to the level of "foul blows" sufficient to constitute prosecutorial misconduct. The credibility of the state's witnesses was at issue at all times, as the state itself brought out in direct *Page 20 
examination the prior convictions and drug usage of its witnesses. Wilmore then assailed the character of these witnesses based on their past criminal histories and drug abuse. The state's comments arguably were an attempt to show that these witnesses must have been credible if they were willing to subject themselves to such questioning. The comments did not refer to Wilmore's failure to present a case in his defense.
 IV {¶ 58} For his fourth assignment of error, Wilmore complains that defense counsel acted ineffectively by failing to request a jury instruction on the lesser included offense of involuntary manslaughter. He maintains that it was possible that the jury could have found no evidence of prior calculation and design or that he did not act with purpose to cause the victim's death.
 {¶ 59} A claim of ineffective assistance of counsel requires a defendant to show that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of the appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. Strickland v. Washington (1984),466 U.S. 668. This requires two distinct lines of inquiry. First, we determine "whether there has been a substantial violation of any of defense counsel's essential duties to his client[.]" State v.Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. When making this inquiry, we presume that *Page 21 
licensed counsel has performed in an ethical and competent manner.Vaughn v. Maxwell (1965), 2 Ohio St.2d 299.
 {¶ 60} Second, we determine whether "the defense was prejudiced by counsel's ineffectiveness." Bradley, 42 Ohio St.3d at paragraph two of the syllabus. Prejudice requires a showing to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at paragraph three of the syllabus.
 {¶ 61} Our review of claims of ineffective assistance of counsel is undertaken with the understanding that we are not in a position to second-guess trial counsel. In Strickland, the United States Supreme Court stated, "[j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Strickland,466 U.S. at 689. Debatable trial tactics will not form a basis for proving ineffective assistance of counsel. State v. Hoffner, 102 Ohio St.3d 358,2004-Ohio-3430, para: 45.
 {¶ 62} Trial decisions on whether to seek instructions on lesser included offenses are matters of trial strategy that will not establish ineffective assistance of counsel. State v. Clayton (1980),62 Ohio St.2d 45, 47. The record shows that trial counsel had requested instructions on the lesser included offenses of negligent *Page 22 
homicide and reckless homicide, but had withdrawn those requests at the close of all evidence. Having raised and withdrawn the request for these lesser included offense instructions, we can only conclude that counsel made a strategic decision to seek an outright acquittal on the aggravated murder and murder counts. That decision fell within the ambit of debatable trial tactics and does not establish that counsel violated an essential duty to Wilmore. See State v. Panza, Cuyahoga App. No. 84177, 2005-Ohio-94, ¶ 24; State v. Irwin, Hocking App. No. 03CA13,2004-Ohio-1129, para: 33.
 V {¶ 63} Finally, Wilmore complains that his prison sentence for aggravated murder — life imprisonment with parole eligibility after 25 full years of imprisonment-was disproportionate. He maintains that the minimum prison term for aggravated murder, life with parole eligibility after 20 years of imprisonment, was more appropriate under the circumstances.
 {¶ 64} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856,1J100, the Ohio Supreme Court eliminated sentencing provisions that required judicial fact-finding and held that the trial courts have full discretion to impose any sentence authorized by law that is in accordance with the stated purposes and principles of felony sentencing. The purposes and principles of felony sentencing are set forth in R.C.2929.11 and, even after Foster, continue to promote the goals of protecting the *Page 23 
public and punishing the offender. Foster, 109 Ohio St.3d at ¶ 96, 98;State v. Clay, Cuyahoga App. Nos. 89339-89341, 2008-Ohio-314, para: 7.
 {¶ 65} An appellate court may not disturb a trial court's sentencing determination absent clear and convincing evidence that either the record does not support the sentence, or the sentence is contrary to law. State v. Williams, Cuyahoga App. No. 88137, 2007-Ohio-3897, para: 37; State v. Samuels, Cuyahoga App. No. 88610, 2007-Ohio-3904, para: 7.
 {¶ 66} Wilmore's sentence is indisputably within the statutory range for aggravated murder,[1] so it plainly is not contrary to law. SeeState v. Cremeens, Vinton App. No. 06CA646, 2006-Ohio-7092, ¶ 12. We only consider whether there is clear and convincing evidence to show that the record does not support the sentence.
 {¶ 67} Wilmore offers no support for his argument that the court should have imposed the minimum term of life imprisonment with parole eligibility after 20 years of prison, apart from arguing that the court failed to give any reasons as to why a shorter prison term would be inappropriate. Foster, however, makes clear that the "trial courts are no longer required to make findings or give their reasons for *Page 24 
imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus. We therefore conclude that Wilmore has failed to show by clear and convincing evidence that the record does not support the length of the sentence.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
SEAN C. GALLAGHER, P.J., and MARY EILEEN KILBANE, J., CONCUR
[1] R.C. 2929.03 sets forth the applicable prison terms for aggravated murder. As applicable to this case, those terms are life imprisonment without parole; life imprisonment with parole eligibility after serving 20 years of imprisonment; life imprisonment with parole eligibility after serving 25 full years of imprisonment; or life imprisonment with parole eligibility after serving 30 full years of imprisonment. See R.C.2929.03(A)(1). *Page 1