JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Aaron Addison ("Addison"), appeals his conviction and sentence. Finding no merit to the appeal, we affirm.
 {¶ 2} In 2006, Addison was charged with aggravated murder, three counts of attempted murder, and having a weapon while under a disability. The aggravated and attempted murder charges were accompanied by one-and three-year gun specifications. Addison's first trial ended in a mistrial. At the second trial, the jury convicted him of aggravated murder and two counts of attempted murder but acquitted him of one count of attempted murder and all gun specifications. The court convicted Addison of having a weapon while under a disability.
 {¶ 3} The following evidence was adduced at trial.
 {¶ 4} On a Saturday night in August 2006, codefendant Reginald Wilmore ("Wilmore") went to the apartment of Latrice Cromwell ("Latrice"), who lived in a Cleveland Metropolitan Housing Authority apartment.[1]
Latrice operated a "convenience store" out of her apartment, selling snack items, soft drinks and beer. Latrice and her boyfriend also sold cocaine and marijuana out of her "store." Wilmore wanted to buy a beer from Latrice, but she would not sell him any because she did not know him. Latrice's friend closed the door on Wilmore, so he angrily *Page 4 
kicked the door. Latrice opened the door and Wilmore punched her, knocking a cell phone from her hand. A fight ensued, and Wilmore left when Latrice called police.
 {¶ 5} Latrice testified that Wilmore returned with two other men, one of whom was holding a baseball bat. The two groups engaged in a "verbal battle" before Wilmore's group eventually left. Wilmore returned alone and apologized to Latrice. He asked whether she had found a key he claimed he had lost during the altercation. Latrice refused to return the key and told him she would give it to police. Wilmore told Latrice that "it's not over b***" and walked away.
 {¶ 6} Latrice then called her boyfriend, Carlos Holder ("Holder"), to tell him about the fight. Holder and Latrice's cousin, Charles Cromwell ("Charles"), came to her apartment, joined by Holder's cousin. After hearing what happened, Holder called two more of his friends and asked them to come over. The four men went out to look for Wilmore, leaving Charles behind with Latrice.
 {¶ 7} The four men came upon a small group of people that included Addison, whom they knew by the nickname "Wax," and Ricky Ogletree ("Ogletree"). Wilmore was not with the group. Ogletree testified that Holder pointed his finger at him, and started to say something when three other men came running up and started shooting. Ogletree testified that he ran and someone shot at him. Holder denied having a gun that evening but admitted that two of the men with him might have had guns. Holder claimed that some of the men in Addison's group also had guns. *Page 5 
 {¶ 8} Latrice and her friend testified that they heard shooting just a few minutes after the four men left. Holder returned to the apartment, afraid that Addison and his friends were going to retaliate against him. He told the women to gather the children and go across the street to his aunt's house. They spent Sunday at a friend's house.
 {¶ 9} On Sunday evening, Latrice and Holder returned to her apartment. Fearing that there would be trouble, Holder went to his aunt's house and got his gun.
 {¶ 10} Another witness who lived near the shooting site testified that shortly before the shooting, she had been walking to buy drugs when she saw Wilmore talking with two other men near Latrice's apartment. She testified that Wilmore was holding a shotgun. A few minutes later, the witness was walking back along the same route and saw Wilmore standing with four or five other men, one of whom she identified as Addison. Wilmore still carried the shotgun, and when she walked by them, she heard someone say, "What is we gonna do? She can get it too, let's make it happen." The witness kept walking, but before she could get to her apartment, she heard the sound of weapons discharging, including a shotgun and what sounded like "mild shots."
 {¶ 11} Latrice testified that on the evening of the shooting, Addison came to her porch holding a shotgun. She testified that Addison told her to leave with her daughter and send Holder outside. Holder testified that Latrice came back inside the apartment and told him that Addison had threatened to shoot up the house and was *Page 6 
outside with a shotgun. Charles was also in the apartment, asleep on the kitchen floor. Latrice awakened Charles and took her child into her bedroom.
 {¶ 12} An upstairs neighbor overheard Latrice talking to two men. The neighbor testified that she heard one of the men tell Latrice that he was not trying to disrespect her but that they wanted Holder out of her house. The neighbor observed that the men each carried shotguns. The neighbor went down to Latrice's apartment and invited them to her apartment for safety. Moments later, the neighbor testified she heard gunshots and ran into the bedroom closet with Latrice.
 {¶ 13} One of the gunshots hit Charles in the head, killing him. Holder went into the living room where Charles had been shot and fired out the window. A bullet grazed Holder in the shoulder.
 {¶ 14} Latrice testified that she saw Addison's purple convertible leaving the scene at a fast rate. Ogletree testified that he saw Addison later that evening at a party, and Addison told him that "someone got shot."
 {¶ 15} The police recovered five shell casings from a 9mm firearm outside the apartment, all of which were fired from the same weapon. No shotgun shells were recovered, but the police found a number of "defects" in the porch screen door and the brick wall surrounding the screen door. A police expert testified these defects were consistent with multiple projectile shotgun rounds. Other defects were located in the window frame that were also consistent with being shot from a shotgun. The expert further testified that he examined Holder's gun but, in his opinion, the *Page 7 
fragment recovered from Charles's body could not have been fired from Holder's gun.
 {¶ 16} The coroner testified that the bullet that struck the victim had traveled through his brain in a slightly downward trajectory. The coroner said the trajectory of the bullet did not rule out the theory that it had been fired from outside the apartment.
 {¶ 17} A police detective testified regarding three oral statements Addison made to police while in custody. Addison told detectives he was with friends the night before Charles was shot when Holder "and his boys ran up on them." Addison stated that one of the men with Holder asked him if he had a problem with Latrice and then began shooting at them. Addison also told police that he went to Latrice's the next night and spoke with her. He denied having a gun or shooting anyone. During his second oral statement, Addison told detectives that he had spoken with Wilmore in jail, and Wilmore had told him that a man named "Fiend" was the other shooter. Addison told detectives that Wilmore had the 9mm gun and "Fiend" had a shotgun. The detective testified that through his investigation he concluded that "Fiend" did not exist.
 {¶ 18} The court sentenced Addison to life without the possibility of parole for aggravated murder, ten years for attempted murder, and five years for having a weapon while under a disability, with the sentences to be served concurrently.
 Sufficiency and Manifest Weight of the Evidence *Page 8 {¶ 19} Addison raises six assignments of error for our review. In the first assignment of error, Addison argues that there was insufficient evidence to support his convictions for aggravated murder and attempted murder. In the second assignment of error, Addison argues that the convictions were against the manifest weight of the evidence.
 {¶ 20} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52,678 N.E.2d 541.
 {¶ 21} While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion. Thompkins at 390. When a defendant asserts that his conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a *Page 9 
manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. at 387.
 {¶ 22} Addison was convicted of the aggravated murder of Charles Cromwell, in violation of R.C. 2903.01(A), which states that no person shall purposely, and with prior calculation and design, cause the death of another. "Prior calculation and design" is not defined by the Revised Code. In State v. Cotton (1978), 56 Ohio St.2d 8, 381 N.E.2d 190, paragraph three of the syllabus, the Ohio Supreme Court stated:
 "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." Id. at paragraph three of the syllabus.
 {¶ 23} Addison was also convicted of two counts of attempted murder, in violation of R.C. 2903.02 and 2923.02, in that he purposely attempted to cause the deaths of Latrice Cromwell and Carlos Holder.
 {¶ 24} Addison argues that the evidence was legally insufficient to find that he participated in the murder. He claims that the evidence at trial merely showed that he went to Latrice's apartment to warn her and then left the area, that no one witnessed him shoot a gun, and that Latrice's testimony was inconsistent and contradicted by other State witnesses.
 {¶ 25} R.C. 2923.03(A)(2) states that no person, "acting with the kind of culpability required for the commission of an offense," shall "[a]id or abet another in *Page 10 
committing the offense[.]" A person aids or abets in a crime when the evidence shows that "the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v. Johnson, 93 Ohio St.3d 240, 2001-Ohio-1336,754 N.E.2d 796, syllabus. Criminal intent "can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." In re T.K., 109 Ohio St.3d 512,2006-Ohio-3056, ¶ 13, 849 N.E.2d 286, citing Johnson, at 245.
 {¶ 26} We find that a rational trier of fact could find that the State presented evidence which, when viewed most favorably to the State, established the essential elements of aggravated murder. Addison's friend, Wilmore, engaged in a physical altercation with Latrice. Holder and others went looking for Wilmore. When Holder found Addison, Wilmore was not present, but an argument ensued and shots were fired. The next evening, Wilmore and Addison were observed talking to each other near Latrice's apartment, holding guns just minutes before the fatal shooting. Both men were dressed entirely in black and wore hooded sweatshirts. One of the men was heard to say, "What is we gonna do? She can get it too, let's make it happen" and, moments later, witnesses heard the sound of both a shotgun and other guns being fired. The police confirmed that both a shotgun and a 9mm handgun were used in the incident. *Page 11 
 {¶ 27} Addison admitted to police that he was shot at the day before the murder and that he was upset about it. He also admitted that he met with Wilmore the evening of the murder, but he claimed that Wilmore and his friends were the ones talking about getting revenge. He also told police that he spoke with Latrice moments before the shooting, but insisted that he was just warning her to get out of the apartment. Yet both Latrice and the upstairs neighbor testified that Addison was holding a gun when he was telling her to leave the apartment and send Holder outside.
 {¶ 28} Addison argues that the State failed to offer sufficient evidence that actually placed him on the scene when the shooting occurred. We disagree. Although none of the witnesses actually saw Addison shoot into the apartment, he was seen in Wilmore's company just moments before the fatal shooting, and Latrice and her upstairs neighbor observed him holding a gun.
 {¶ 29} Moreover, Addison's conduct showed his intent to aid and abet. By dressing similarly to Wilmore, carrying a gun, and warning Latrice to leave and instructing her to send Holder outside, he showed his criminal intent to carry out the shooting, and therefore purposely, by prior calculation and design, caused Charles's death.
 {¶ 30} Addison also claims that Latrice's testimony was inconsistent with that of other witnesses and she lied during her testimony. Latrice admittedly had credibility issues, nearly all of which stemmed from her desire to hide her *Page 12 
"convenience" store business from the authorities. These and other issues of credibility did not, however, contradict the basic elements of her testimony relating to the shooting, all of which were corroborated by other witnesses.
 {¶ 31} The witness who saw Wilmore and Addison just prior to the shooting admitted that she was a drug addict and had been searching for drugs that night. Despite this admission, she testified that she had been unable to locate drugs and was returning to her house when she observed Wilmore and Addison in the street. She knew both men, recognizing Addison's distinctive purple convertible. After observing Wilmore with a shotgun, her belief that something was about to happen was corroborated not only by evidence that other witnesses heard a shotgun being fired just moments later, but by the recovery of shotgun pellets from the exterior of the apartment. And even though she admitted at trial that she was no longer certain that Addison was in the group, she originally told police he was there and, a month after the shooting, was able to identify Addison from a photo array as one of the men she saw in the group that night. Moreover, Addison, in his statements to police, placed himself with the group immediately before the shooting.
 {¶ 32} Thus, although one witness backed off her original story about who she saw the night of the shooting, and there were some inconsistencies in Latrice's testimony in that she denied that crack cocaine was being sold from her apartment, these inconsistencies do not lead to the conclusion that there was insufficient *Page 13 
evidence to support Addison's conviction or that his conviction was against the manifest weight of the evidence.
 {¶ 33} Therefore, the first and second assignments of error are overruled.
 Ineffective Assistance of Counsel {¶ 34} In the third assignment of error, Addison argues that he was denied effective assistance of counsel due to his attorney's failure to request a jury instruction on the lesser included offense of involuntary manslaughter.
 {¶ 35} In a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an objective standard of reasonable representation and prejudiced the defense. State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus; Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674. To determine whether counsel was ineffective, Addison must show that: (1) counsel's performance was deficient, in that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment, and (2) counsel's deficient performance prejudiced the defense in that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.Strickland.
 {¶ 36} In Ohio, a properly licensed attorney is presumed competent.Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301, 209 N.E.2d 164. In evaluating whether a petitioner has been denied the effective assistance of counsel, the Ohio Supreme *Page 14 
Court held that the test is "whether the accused, under all the circumstances, * * * had a fair trial and substantial justice was done."State v. Hester (1976), 45 Ohio St.2d 71, 341 N.E.2d 304, paragraph four of the syllabus.
 {¶ 37} When making that evaluation, a court must determine whether there has been a substantial violation of any of defense counsel's essential duties to his client and whether the defense was prejudiced by counsel's ineffectiveness. State v. Lytle (1976), 48 Ohio St.2d 391,358 N.E.2d, 623; State v. Calhoun, 86 Ohio St.3d 279, 289, 1999-Ohio-102,714 N.E.2d 905. To show that a defendant has been prejudiced, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Bradley, at paragraph three of the syllabus;Strickland.
 {¶ 38} Involuntary manslaughter is a lesser included offense of aggravated murder. State v. Thomas (1988), 40 Ohio St.3d 213,533 N.E.2d 286, paragraph one of the syllabus. "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense."Thomas, at paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to defendant.State v. Smith, 89 Ohio St.3d 323, 331, 2000-Ohio-166, 731 N.E.2d 645;State v. Wilkins (1980), 64 Ohio St.2d 382, 388, 415 N.E.2d 303. *Page 15 
 {¶ 39} An instruction is not warranted every time any evidence is presented on a lesser included offense. There must be "sufficient evidence" to allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included offense. State v.Shane (1992), 63 Ohio St.3d 630, 632-633, 590 N.E.2d 272.
 {¶ 40} A defendant does not receive ineffective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. State v. Stojetz, Madison App. No. CA2002 04-06, 2002-Ohio-6520. Moreover, it is not the role of a reviewing court to second-guess the strategic decisions of trial counsel. In fact, we have said that the decision whether to request a jury instruction with regard to a lesser included offense constitutes trial strategy and does not establish ineffective assistance of trial counsel. State v.Buehner, Cuyahoga App. No. 81722, 2004-Ohio-463; State v. Griffie,74 Ohio St.3d 332, 1996-Ohio-71, 658 N.E.2d 764.
 {¶ 41} In view of the evidence presented at trial and the deference given to defense counsel's strategic decisions, we cannot say that Addison was denied effective assistance of counsel.
 {¶ 42} Therefore, the third assignment of error is overruled.
 Sentencing {¶ 43} In the fourth assignment of error, Addison argues that the trial court abused its discretion in sentencing him to life without the possibility of parole. *Page 16 
 {¶ 44} "Appellate courts must apply a two-step approach when reviewing felony sentences. First, they must examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law. If this first prong is satisfied, the trial court's decision in imposing the term of imprisonment is reviewed under the abuse-of-discretion standard." State v. Kalish, 120 Ohio St.3d 23,2008-Ohio-4912.[2]
 {¶ 45} During sentencing, trial courts are no longer required to engage in judicial fact-finding. State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 470; see, also, State v. Payne,114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306 ("Foster gives judges full discretion to impose a sentence within the statutory range without having to `navigate a series of criteria that dictate the sentence.'") Nonetheless, trial courts must still consider R.C. 2929.11 and 2929.12
when sentencing an offender. Id. at ¶ 13.
 {¶ 46} Contrary to Addison's assertion that the trial court must state that it considered R.C. 2929.11 and 2929.12 when sentencing an offender, "where the trial court does not put on the record its consideration of R.C. 2929.11 and 2929.12, it is presumed that the trial court gave proper consideration to those statutes." State v. Adams (1988),37 Ohio St.3d 295, 525 N.E.2d 1361, paragraph three of the syllabus. In reviewing the record, the trial court gave careful and substantial *Page 17 
deliberation to the relevant statutory considerations, even if the court did not expressly state which statutes it considered when imposing Addison's sentence.
 {¶ 47} Addison does not dispute that the sentence imposed by the trial court fell within the statutory range for the crimes for which he was found guilty or that the sentence is otherwise contrary to law. Thus, we next determine whether the trial court abused its discretion. An abuse of discretion is "`more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157,404 N.E.2d 144.
 {¶ 48} Addison claims that it was improper for the trial court to sentence him to a more harsh sentence than his codefendant, Wilmore, who received a life sentence with the possibility of parole after twenty-five years. We disagree. In sentencing Addison, the trial court discussed his extensive criminal record involving drugs and domestic violence and noted that Addison had not learned from his past behavior.
 {¶ 49} Thus, we find that Addison's sentence is neither clearly and convincingly contrary to law nor does it constitute an abuse of discretion.
 {¶ 50} Therefore, the fourth assignment of error is overruled.
 Hearsay Evidence {¶ 51} In the fifth assignment of error, Addison argues that the trial court erred in permitting the State to introduce inadmissible hearsay evidence. *Page 18 
 {¶ 52} Evid. R. 801(C) defines hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Statements which explain an officer's conduct while investigating a crime and not admitted to prove the truth of the statement are not hearsay. See Evid. R. 801(C); State v. Blevins (1987), 36 Ohio App.3d 147, 149,521 N.E.2d 1105; State v. Thomas (1980), 61 Ohio St.2d 223, 232,400 N.E.2d 401. The probative value of such statements must outweigh any unfair prejudice. Id.; see Evid. R. 403.
 {¶ 53} Addison complains that it was improper for the trial court to allow statements into evidence from the detective who testified regarding his investigation into whether "Fiend" was involved in the shooting. The detective testified that Addison told him that he could find out "Fiend's" real name by contacting Addison's girlfriend. The detective then testified that he contacted the girlfriend and "learned from her that she has never, ever heard that name Fiend, doesn't know that person, never heard of that person."
 {¶ 54} We find that the statements by the testifying officer were not offered to prove the truth of the statement that the girlfriend did not know "Fiend," but rather to show the police followed up on the lead Addison provided and to explain why the police investigation ruled out "Fiend" as a suspect.
 {¶ 55} Therefore, the fifth assignment of error is overruled.
 Codefendant's Trial Transcripts *Page 19 {¶ 56} In the sixth assignment of error, Addison argues that the State committed prosecutorial misconduct when it introduced and argued inconsistent theories of culpability in his trial and the trial of his codefendant and that his trial counsel was ineffective for failing to object to the arguments.
 {¶ 57} To support his assignment of error, Addison relies on the transcripts from Wilmore's trial, which he sought to file with this court. This court, however, granted the State's motion to strike the transcripts from the record because they were not part of the record below in Addison's case; thus, we cannot consider them. See State v.George, Cuyahoga App. No. 90511, 2008-Ohio-5128, citing State v.Ishmail (1978), 54 Ohio St.2d 402, 377 N.E.2d 500, paragraph one of the syllabus (holding that a reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter). Such evidence is allowed in a petition for postconviction relief.
 {¶ 58} Since Addison's argument for this assignment of error rests solely on matters outside of the record, the sixth assignment of error is overruled.
 {¶ 59} Accordingly, judgment is affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's *Page 20 
conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MARY EILEEN KILBANE, J., and CHRISTINE T. McMONAGLE, J., CONCUR.
[1] We affirmed Wilmore's conviction for aggravated murder, attempted murder, and having a weapon while under a disability. State v.Wilmore, Cuyahoga App. No. 89960, 2008-Ohio-3148.
[2] We recognize Kalish is merely persuasive and not necessarily controlling because it has no majority. The Supreme Court split over whether we review sentences under an abuse-of-discretion standard in some instances. *Page 1