[Cite as *State v. Addison*, 2024-Ohio-5805.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                                   No. 113533

    v.                            :

AARON ADDISON,                          :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** December 12, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-06-486979-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Frank Romeo Zeleznikar, Assistant Prosecuting Attorney, *for appellee.*

Kimberly Kendall Corral and Gabrielle M. Ploplis, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Aaron Addison ("Addison"), appeals the trial court's denial of his motion for leave to file a motion for a new trial. The trial court found that Addison was not unavoidably prevented from discovering the evidence

set forth in his motion, and thus not entitled to leave. For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} In 2006, Addison was charged with aggravated murder in the shooting death of Charles Cromwell ("Charles"). In addition, he was charged with the attempted murder of Latrice Cromwell ("Latrice"), Carlos Holder ("Holder"), and Tanisha Workman, as well as having a weapon while under disability arising out of the same facts.[1] Addison's first trial in April 2007 ended in a mistrial. At the second trial in October 2007, the jury convicted him of aggravated murder and two counts of attempted murder but acquitted him of one count of attempted murder and all firearm specifications. The court convicted Addison of having a weapon while under disability. The court sentenced Addison to life without the possibility of parole for aggravated murder, ten years for attempted murder, and five years for having a weapon while under disability, with the sentences to be served concurrently. Addison's convictions were affirmed on appeal by this court in *State v. Addison*, 2009-Ohio-221 (8th Dist.).

{¶ 3} The facts underlying this matter were summarized by this court in Addison's direct appeal. Additional testimony pertinent to this appeal is added in brackets. The following was adduced at trial:

> On a Saturday night in August 2006, codefendant Reginald Wilmore
> ("Wilmore") went to the apartment of Latrice Cromwell ("Latrice"),

[1] The codefendant, Reginald Wilmore, was tried separately and his conviction for aggravated murder, attempted murder, and having a weapon while under disability was affirmed by this court in *State v. Wilmore*, 2008-Ohio-3148 (8th Dist.).

who lived in a Cleveland Metropolitan Housing Authority ["C.M.H.A."] apartment. Latrice operated a "convenience store" out of her apartment, selling snack items, soft drinks and beer. Latrice and her boyfriend [Carlos Holder] also sold cocaine and marijuana out of her "store." Wilmore wanted to buy a beer from Latrice, but she would not sell him any because she did not know him. Latrice's friend closed the door on Wilmore, so he angrily kicked the door. Latrice opened the door and Wilmore punched her, knocking a cell phone from her hand. A fight ensued, and Wilmore left when Latrice called police.

Latrice testified that Wilmore returned with two other men, one of whom was holding a baseball bat. The two groups engaged in a "verbal battle" before Wilmore's group eventually left. Wilmore returned alone and apologized to Latrice. He asked whether she had found a key he claimed he had lost during the altercation. Latrice refused to return the key and told him she would give it to police. Wilmore told Latrice that "it's not over b***" and walked away.

Latrice then called her boyfriend, Carlos Holder ("Holder"), to tell him about the fight. Holder and Latrice's cousin, Charles Cromwell ("Charles"), came to her apartment, joined by Holder's cousin. After hearing what happened, Holder called two more of his friends and asked them to come over. The four men went out to look for Wilmore, leaving Charles behind with Latrice.

The four men came upon a small group of people that included Addison, whom they knew by the nickname "Wax," and Ricky Ogletree ("Ogletree"). Wilmore was not with the group. Ogletree testified that Holder pointed his finger at him and started to say something when three other men came running up and started shooting. Ogletree testified that he ran, and someone shot at him. Holder denied having a gun that evening but admitted that two of the men with him might have had guns. Holder claimed that some of the men in Addison's group also had guns.

Latrice and her friend testified that they heard shooting just a few minutes after the four men left. Holder returned to the apartment, afraid that Addison and his friends were going to retaliate against him. He told the women to gather the children and go across the street to his aunt's house. They spent Sunday at a friend's house.

On Sunday evening, Latrice and Holder returned to her apartment. Fearing that there would be trouble, Holder went to his aunt's house and got his gun.

Another witness [Tewana Anderson ("Tewana")] who lived near the shooting site testified that shortly before the shooting, she had been walking to buy drugs when she saw Wilmore talking with two other men near Latrice's apartment. She testified that Wilmore was holding a shotgun. A few minutes later, [Tewana] was walking back along the same route and saw Wilmore standing with four or five other men, one of whom she [originally] identified as Addison [to police but testified at trial that she did not see Addison that day. Tewana remained firm in her testimony that she did not see Addison that day.] Wilmore still carried the shotgun, and when she walked by them, she heard someone say, "What is we gonna do? She can get it too, let's make it happen." [Tewana] kept walking, but before she could get to her apartment, she heard the sound of weapons discharging, including a shotgun and what sounded like "mild shots." [Tewana told police and testified at trial that she observed Addison's purple convertible near the area on the day of the shooting.]

Latrice testified that on the evening of the shooting, Addison came to her porch holding a shotgun. She testified that Addison told her to leave with her daughter and send Holder outside. Holder testified that Latrice came back inside the apartment and told him that Addison had threatened to shoot up the house and was outside with a shotgun. Charles was also in the apartment, asleep on the kitchen floor. Latrice awakened Charles and took her child into her bedroom.

An upstairs neighbor overheard Latrice talking to two men. The neighbor testified that she heard one of the men tell Latrice that he was not trying to disrespect her but that they wanted Holder out of her house. The neighbor observed that the men each carried shotguns. The neighbor went down to Latrice's apartment and invited them to her apartment for safety. Moments later, the neighbor testified she heard gunshots and ran into the bedroom closet with Latrice.

One of the gunshots hit Charles in the head, killing him. Holder went into the living room where Charles had been shot and fired out the window. A bullet grazed Holder in the shoulder.

Latrice testified that she saw Addison's purple convertible leaving the scene at a fast rate. Ogletree testified that he saw Addison later that evening at a party, and Addison told him that "someone got shot."

The police recovered five shell casings from a 9mm firearm outside the apartment, all of which were fired from the same weapon. No shotgun shells were recovered, but the police found a number of "defects" in the

porch screen door and the brick wall surrounding the screen door. A police expert testified these defects were consistent with multiple projectile shotgun rounds. Other defects were located in the window frame that were also consistent with being shot from a shotgun. The expert further testified that he examined Holder's gun but, in his opinion, the fragment recovered from Charles's body could not have been fired from Holder's gun.

The coroner testified that the bullet that struck the victim had traveled through his brain in a slightly downward trajectory. The coroner said the trajectory of the bullet did not rule out the theory that it had been fired from outside the apartment.

A police detective testified regarding three oral statements Addison made to police while in custody. Addison told detectives he was with friends the night before Charles was shot when Holder "and his boys ran up on them." Addison stated that one of the men with Holder asked him if he had a problem with Latrice and then began shooting at them. Addison also told police that he went to Latrice's the next night and spoke with her. [Addison confirmed that his purple convertible was parked in the area during the shooting.] He denied having a gun or shooting anyone. During his second oral statement, Addison told detectives that he had spoken with Wilmore in jail, and Wilmore had told him that a man named "Fiend" was the other shooter. Addison told detectives that Wilmore had the 9mm gun and "Fiend" had a shotgun. The detective testified that through his investigation he concluded that "Fiend" did not exist.

*Addison* at ¶ 2-18.

**{¶ 4}** On May 17, 2023, nearly 16 years after the jury verdict Addison filed a motion for leave to file a motion for new trial, premised on "newly discovered" evidence. The material in support of his motion were as follows:

1. An affidavit from Tewana Anderson ("Tewana") stating that she did not see Addison the night of the shooting; she observed Addison's purple vehicle parked in the area; she observed Wilmore, the co-defendant, with a shotgun; she received $1200 from Crime Stoppers; and she had a sexual relationship with a detective in the case. (Addison's Motion for Leave, Exhibit A.)

2. An unsworn statement from Shontia Howard ("Shontia"), the mother of one of Addison's children, claiming that a man named Kenneth Smith, a.k.a. "Flynn" was the actual shooter. (Addison's Motion for Leave, Exhibit B.)

3. An affidavit from Eureka Barbour ("Eureka"), the mother of one of Addison's children, claiming that she was on the phone with Addison at the time of the shooting. (Addison's Motion for Leave, Exhibit C.)

4. An affidavit from Tom Pavlish alleging that Takeshea Humphrey, who is now deceased, told him that Kenneth Smith was the shooter. (Addison's Motion for Leave, Exhibit D.)

5. A letter from the prosecutor to the homicide detective, stating that he had identified a potential alternative suspect, Jonathan Steele, a.k.a. "Mango." (Addison's Motion for Leave, Exhibit E.)

{¶ 5} On December 5, 2023, after the motion for leave had been fully briefed by the parties, the trial court issued an order and opinion denying Addison's motion for leave without holding a hearing. The trial court summarized the evidence as follows:

> The material provided in support of Defendant's Motion for Leave consists of unsworn statements, inadmissible hearsay, information that he was aware of prior to trial, information that he should have been aware of prior to trial, and affidavits containing uncorroborated and noncredible allegations. As further demonstrated, this evidence does not warrant the granting of a motion for leave to file a motion for new trial.

(Order filed on Dec. 5, 2023.) The trial court then described each document attached to Addison's motion and its content and explained how Addison failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from discovering any of the evidence Addison claimed would require a new trial.

{¶ 6} It from this order that Addison appeals, raising the following assignments of error:

**Assignment of Error I:** The trial court abused its discretion in denying Aaron Addison's motions for leave to file a motion for a new trial as the evidence presented meets the requisite standard required under Crim.R. 33.

> **A.** Addison has demonstrated that he was unavoidably prevented from discovering the evidence within 120 days after the trial verdict.
> **B.** Addison has demonstrated that the materiality standard under Crim.R. 33 has been satisfied in this case.

**Assignment of Error II:** The trial court abused its discretion in failing to hold an evidentiary hearing, as Addison established unavoidable prevention, and the affidavits presented meet the *Calhoun* Standard.

**Assignment of Error III:** The trial court erred in replacing the unavoidable prevention standard of Crim.R. 33(B) with the third *Petro* Factor.

**Assignment of Error IV:** The trial court erred in considering the merits of Addison's claims without granting leave.

**Assignment of Error V:** The trial court erred in applying an improper standard to assess Addison's *Brady* Claims.

**Assignment of Error VI:** The trial court erred for assigning Shontia Howard's statement no evidentiary value and failing to consider it in its determination of whether to grant an evidentiary hearing.

**Assignment of Error VII:** The trial court erred in recusing itself from Addison's case absent publication for reasoning supporting its recusal.

{¶ 7} For the reasons set forth below, we affirm.

## II. Law and Analysis

{¶ 8} Addison's first six assignments of error are interrelated and will be addressed together.

## Standard of Review

{¶ 9} On appeal, we review the denial of a motion for leave to file a delayed motion for a new trial under the abuse-of-discretion standard. *State v. Walker*, 2023-Ohio-2689, ¶ 11 (8th Dist.), citing *State v. Hill*, 2020-Ohio-102, ¶ 13 (8th Dist.). The decision on whether to hold a hearing on the motion is also reviewed for an abuse of discretion. *State v. Logan*, 2024-Ohio-2360, ¶ 16 (8th Dist.), citing *State v. Phillips*, 2017-Ohio-7164, ¶ 21 (8th Dist.), citing *State v. Sutton*, 2016-Ohio-7612, ¶ 13 (8th Dist.). An abuse of discretion occurs when a court exercises "'its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority.'" *Walker* at ¶ 11, quoting *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

## Motion for Leave to File a Motion for a New Trial under Crim.R. 33

{¶ 10} Addison filed his motion for a new trial pursuant to Crim.R. 33(A)(6), which allows a trial court to grant a new trial where "new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial" and the defendant's "substantial rights" are "materially affect[ed]." When a motion for a new trial is made on grounds of newly discovered evidence, the motion must be filed within 120 days of the verdict, unless the defendant can prove "by clear and convincing evidence" that he was "unavoidably prevented" from discovering the evidence and filing the motion within the allotted time frame. Crim.R. 33(B). If a defendant files the motion outside the

time frame, as is the case here, they must first seek leave of court to file a delayed motion for a new trial. Crim.R. 33(B). "Thus, a motion for leave must demonstrate two things: (1) that the defendant has obtained what constitutes newly discovered evidence; and (2) that the defendant was 'unavoidably prevented' from timely discovering that evidence." *State v. Smith*, 2024-Ohio-1360, ¶ 47 (8th Dist.).

{¶ 11} "Clear and convincing" evidence is that "measure or degree of proof" that "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Id.* at ¶ 48, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Id.*, quoting *Ledford* at 477.

{¶ 12} When a defendant seeks leave to file a motion for a new trial under Crim.R. 33(B), the trial court may not consider the merits of the proposed motion for a new trial unless and until it grants the motion for leave. *State v. Hatton*, 2022-Ohio-3991, ¶ 30, 33; *State v. Bethel*, 2022-Ohio-783, ¶ 41. The sole question before the trial court is whether the defendant has established by clear and convincing proof that he was unavoidably prevented from discovering the evidence on which he seeks to base the motion for a new trial within the time frame provided. *Hatton* at ¶ 30; *State v. Hale*, 2023-Ohio-3894, ¶ 20 (8th Dist.). A defendant's "mere allegation" that he was unavoidably prevented from discovering the evidence he seeks to introduce to support a new trial does not meet that burden. *Smith* at ¶ 49,

citing *State v. McFarland*, 2022-Ohio-4638, ¶ 17 (8th Dist.); *State v. Hubbard*, 2020-Ohio-2726, ¶ 29 (8th Dist.); *State v. Cowan*, 2020-Ohio-666, ¶ 10 (8th Dist.).

{¶ 13} A defendant is entitled to a hearing on a motion for leave to file an untimely motion for a new trial only if the defendant submits documents that "on their face" supports his claim that he was unavoidably prevented from timely discovering the grounds for the motion. *Id.* at ¶ 51.[2] Accordingly, the issue before us on appeal is whether Addison submitted documents in support of his motion for leave that "on their face" support Addison's claim that he was unavoidably prevented from timely discovering the grounds for his motion so as to entitle him to a hearing on his motion for leave.

{¶ 14} "One way that a defendant may satisfy the 'unavoidably prevented' require[ment] contained in Crim.R. 33(B) is by establishing that the prosecution suppressed the evidence on which the defendant would rely when seeking a new trial." *State v. McNeal*, 2022-Ohio-2703, ¶ 2, citing *Bethel*, 2022-Ohio-783, at ¶ 25. Another example would be an affidavit, recanting a witness's testimony, with demonstration that the "defendant 'was neither aware of the contents of the affidavit

---

[2] *See, e.g., State v. McAlpin*, 2023-Ohio-4794, ¶ 29 (8th Dist.); *McFarland* at ¶ 28; *State v. Dues*, 2017-Ohio-6983, ¶ 12 (8th Dist.); *State v. Ambartsoumov*, 2013-Ohio-3011, ¶ 13 (10th Dist.) (motion for leave to file motion for new trial may be summarily denied where neither the motion nor its supporting affidavits "'embody prima facie evidence of unavoidable delay'"), quoting *State v. Peals*, 2010-Ohio-5893, ¶ 22 (6th Dist.); *State v. Martin*, 2022-Ohio-1494, ¶ 36-37 (8th Dist.) (defendant who submitted evidence that on its face showed he was unavoidably prevented from discovering and presenting evidence sooner was entitled to a hearing on motion for leave to file motion for new trial).

nor aware of the fact that [the witness] would be willing to give such an affidavit[.]'" (Citation omitted.) *State v. Johnson*, 2024-Ohio-134, ¶ 21.

{¶ 15} In this case, Addison submitted five documents alleging recantation of a witness, *Brady* violations, an alibi witness, and a new suspect. Keeping in mind the aforementioned standards, we will address each document in turn to determine whether the documents "on their face" support Addison's claim that he was unavoidably prevented from timely discovering the grounds for his motion so as to entitle him to a hearing on his motion for leave.

### Affidavit from Tewana Anderson

{¶ 16} The first document relied upon by Addison is an affidavit from Tewana where she attested that (1) she did not see Addison the night of the shooting; (2) she observed Addison's purple vehicle parked in the area; (3) she observed Wilmore with a shotgun; (4) she received $1,200 from Crime Stoppers; and (5) she had a sexual relationship with a detective in the case. Addison contends in his filings that he was unavoidably prevented from discovering Tewana's alleged recantation and "favorable *Brady* evidence" because she refused to speak with investigators until 2021 and would not sign an affidavit until 2022. In addition, Addison claims that Tewana feared for her safety.

{¶ 17} First, Addison contends that Tewana is recanting her trial testimony that she observed Addison with Wilmore before the shooting and this would materially affect the outcome of the trial. A witness's recantation of testimony can constitute newly discovered evidence for purposes of Crim.R. 33(A)(6) if the new

testimony would materially affect the defendant's substantial rights and defendant was unavoidably prevented from discovering the recantation. *Smith*, 2024-Ohio-1360, ¶ 50 (8th Dist.). To "recant" is to "[t]o withdraw or renounce (prior statements or testimony) formally or publicly." *Grieser v. Janis*, 2017-Ohio-8896, ¶ 36 (10th Dist.), quoting *Black's Law Dictionary* 1459 (10th Ed. 2014). To "negate" is "1. To deny. 2. To nullify; to render ineffective." *Id.*, quoting *Black's* at 1195.

{¶ 18} While we cannot evaluate the merits of Tewana's affidavit, we still must review the content of her affidavit to determine whether it is newly discovered evidence and whether Addison was unavoidably prevented from discovering it. This court has reviewed Tewana's affidavit, as well as her trial testimony, and we find that her affidavit echoes her trial testimony. Specifically, Tewana testified that she did not see Addison the day of the shooting but did see his purple convertible parked in the area of the shooting. In addition, Tewana testified that she observed Wilmore the night of the shooting with a shotgun in hand, but did not see anyone else with a gun, which is consistent with her affidavit. Tewana's affidavit is not a recantation; therefore, it is not newly discovered evidence.

{¶ 19} Next, Tewana's claims that she had a sexual relationship with one of the detectives that testified at trial and that she received $1,200 from Crime Stoppers for her statement to police. Addison asserts that this is favorable *Brady* material that would have changed the outcome of the trial.

{¶ 20} In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court of the United States recognized that the prosecution has an affirmative duty to disclose

evidence that is favorable to the accused and material to the accused's guilt or punishment. S*ee also Kyles v. Whitley*, 514 U.S. 419, 432 (1995). That "duty encompasses impeachment evidence as well as exculpatory evidence," *Strickler v. Greene*, 527 U.S. 263, 280 (1999), and "it encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Id*. at 280-281, quoting *Kyles* at 438. The *Brady* rule applies regardless of whether evidence is suppressed by the State willfully or inadvertently. *Strickler* at 282.

{¶ 21} The Supreme Court has explained that evidence is favorable to the accused when it is exculpatory or impeaching. *Id*. at 281-282. And "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles* at 433, quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985). A different result is reasonably probable "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id*. at 434, quoting *Bagley* at 678. A defendant establishes a *Brady* violation "by showing that the favorable [but suppressed] evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* at 434.

{¶ 22} "It is well settled that a defendant is entitled to rely on the prosecution's duty to produce evidence that is favorable to the defense." *Bethel,* 2002-Ohio-783, ¶ 25; *see Kyles*, 514 U.S. at 432-433. A defendant seeking to assert a *Brady* claim therefore is not required to show that he could not have discovered

suppressed evidence by exercising reasonable diligence. *Id*., *see Strickler*, 527 U.S. at 282-285. "We hold that when a defendant seeks to assert a *Brady* claim in an untimely or successive petition for postconviction relief, the defendant satisfies the 'unavoidably prevented' requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies." *Id*. Because "'the "unavoidably prevented" requirement in Crim.R. 33(B) "'mirrors the "unavoidably prevented" requirement in R.C. 2953.23(A)(1),'" we must apply the same analysis when determining whether Addison met his burden here. *Id*. at ¶ 59, quoting *State v. Barnes*, 2018-Ohio-1585, ¶ 28 (5th Dist.).

{¶ 23} Ostensibly, Addison is asserting that Tewana's newly alleged relationship with one of the detectives who testified at trial and newly revealed Crime Stopper's payout was suppressed by the State and thus undermines the confidence in the outcome of the trial. We disagree.

{¶ 24} In Tewana's affidavit regarding the detective, she asserted that at trial she testified that "we were friends, but I did not disclose that we had a sexual relationship. [We] exchanged sex for money on several occasions between 2002 and 2006." Assuming, for the sake of argument only, that Tewana's claim is true, we find that this impeachment evidence would have no consequence on the outcome of the trial. First, we note that the detective Tewana is referring to was not the detective investigating Charles's murder. Second, the named detective offered no testimony about the murder or about Addison. The detective simply testified that he knew Tewana for approximately ten years and that he helped her transfer C.M.H.A.

apartments, because she was being evicted, in exchange for providing information to the homicide detectives investigating Charles's death. He also testified that Tewana was a paid informant that he occasionally obtained information from about illegal drug activity occurring on C.M.H.A. property. This information came out during cross-examination, and prior to Tewana's testimony. Third, Tewana testified that she was not evicted and that she was not a paid informant; essentially, calling into question her credibility. Finally, the only evidence Tewana offered against Addison was that she observed his purple convertible in the area of the shooting, which Addison himself confirmed, in his statement to homicide detectives. Therefore, we cannot say that this impeachment evidence, if true, put the whole case in such a different light as to undermine confidence in the verdict.

{¶ 25} Lastly, Tewana asserted in her affidavit that "[i]n cooperating with the police investigation, I received $1,200 from Crime Stoppers for my statement. I did not disclose this during my trial testimony." Addison claims that the State has a duty to disclose such information. The State argues that Crime Stoppers is an independent organization and is not an arm of the government subject to *Brady*.

{¶ 26} The only case addressing Crime Stoppers in this context is *State v. Simmers*, 1999 Wash.App. LEXIS 915, * 12 (May 24, 1999). The *Simmers* Court held that "the State had no *Brady* obligation to seek out and disclose the Crime Stoppers information[.]" The court recognized that based on the record, informants are anonymous, and merely receive a number, and even when they are paid out on their tips, they are never associated with that number. As such, even if the State was

related to Crime Stoppers, it still would have had no ability to discover the names of individual informants. *See id.* at * 11. Therefore, even if Crime Stoppers of Cuyahoga County were run by law enforcement, the tips received are anonymous. Neither law enforcement nor Crime Stoppers would be aware of the anonymous tipster's name unless the tipster wished to reveal themselves. Finally, "*Brady* does not apply to materials that are not 'wholly within the control of the prosecution.'" *State v. Finley*, 2024-Ohio-2636, ¶ 36 (8th Dist.), quoting *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003), quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Nothing in the affidavit states that the State or the police were aware of the Crime Stoppers payout, if it happened at all.

{¶ 27} Although a *Brady* violation can form the basis for a motion for leave to file a motion for a new trial, it is not automatic. Addison has not made a prima facie showing of a *Brady* violation here. Therefore, the trial court did not abuse its discretion when it did not grant leave based on Tewana's affidavit.

### Unsworn Statement of Shontia Howard

{¶ 28} The second document relied upon by Addison is an unsworn statement made to Cleveland Police homicide detectives by Shontia Howard ("Shontia") on September 14, 2021. In this statement, Shontia claims that Addison, her boyfriend at the time, was not the killer, but rather Kenneth Smith a.k.a. "Flynn," is the real killer. Shontia states that she was not truthful with police when she was originally interviewed and that she has always known that Addison was not involved but did not care at that time the murder occurred, even though she was pregnant

with Addison's child at the time. She now alleges that (1) she observed "Flynn" with a shotgun a few minutes before the shooting; (2) "Flynn" told her he was about to shoot up Latrice's apartment; and (3) "Flynn" indirectly threatened her not to come forward several times after the murder. Shontia explained that she is coming forward now for her daughter, who is Addison's child. Shontia claimed that she always told her daughter that her father was not involved in the murder. She also stated that her daughter has a relationship with Addison.

{¶ 29} As we stated previously, a motion for leave must demonstrate that the evidence obtained constitutes non-*Brady* newly discovered evidence and that Addison was unavoidably prevented from discovering the evidence in a timely manner. *Smith*, 2024-Ohio-1360, at ¶ 47. "'[A] party is unavoidably prevented from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for a new trial in the exercise of reasonable diligence.'" *State v. Apanovitch*, 2020-Ohio-4217, ¶ 15 (8th Dist.), quoting *State v. Walden*, 19 Ohio App.3d 141 (10th Dist. 1984). The defendant bears the burden of demonstrating, by clear and convincing evidence, that he was unavoidably prevented from filing his motion within the time prescribed. *McFarland*, 2022-Ohio-4638, at ¶ 17 (8th Dist.), citing *Hubbard*, 2020-Ohio-2726, at ¶ 29 (8th Dist.). To meet this burden, the defendant must present "'more than a mere allegation that he was unavoidably prevented from discovering

the evidence he seeks to introduce to support a new trial.'" *Hubbard,* quoting *Cowan*, 2020-Ohio-666, at ¶ 10 (8th Dist.).

{¶ 30} Here, we cannot say that Addison was unavoidably prevented from discovering Shontia's story. Shontia was Addison's girlfriend at the time of the murder, and she kept in contact with Addison throughout the investigation, trial, and after he was convicted and sentenced. On at least two occasions, she took their daughter to visit him in prison. Further, when Addison spoke with police after the murder, he maintained that him and Shontia were together when he warned Latrice before the shooting, that he did not have a gun, and that he was at Shontia's apartment when the murder occurred. When Shontia was interviewed by police, she stated that her and Addison spoke with Latrice before the shooting and were together at her apartment when the murder occurred. Since the two were together before, during, and after the murder, then Addison would have observed "Flynn" when Shontia did, or could have learned what she witnessed in a reasonable time. Therefore, Addison has failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from obtaining this information from Shontia. Accordingly, the trial court did not abuse its discretion when it denied leave based on Shontia's statement.

**Affidavit of Eureka Barbour**

{¶ 31} The third document relied upon by Addison is an affidavit from Eureka Barbour ("Eureka") where she attested that (1) she witnessed a group of young people across the street from Latrice's apartment; (2) she was on the phone

with Addison and could hear the mother of his child, TT, talking in the background around the time of the shooting; (3) she heard the gunshots and observed the group of men running; and (4) Addison did not socialize with the codefendant. She indicated that she is the mother of one of Addison's children and stated that the police never interviewed her.

{¶ 32} Again, we cannot say that Addison was unavoidably prevented from learning of this witness and her information in a timely fashion. Obviously, if Addison was speaking with Eureka when the murder occurred, he would have informed police at the time of the murder since this was a potential alibi witness. Eureka was the mother of one of his children and therefore known to him. Finally, Eureka does not attest to why she did not come forward until February 2023. Therefore, Addison has failed to demonstrate by clear and convincing evidence that he was unavoidably prevented from obtaining this information from Eureka. Accordingly, the trial court did not abuse its discretion when it denied Addison's motion for leave based on Eureka's affidavit.

### Affidavit of Investigator Tom Pavish

{¶ 33} The fourth document submitted by Addison, was an affidavit of defense investigator Tom Pavish ("Pavish") wherein he stated that he interviewed Takeshea Humphrey ("Humphrey") in 2018 and she claimed that (1) Kenneth Smith was the shooter; (2) she witnessed him jumping off Latrice's balcony with a gun in hand; and (3) Addison and Wilmore did not get along. Humphrey, who is now deceased, never provided a statement to police at the time of the murder.

{¶ 34} In order for Addison to prove that a new trial is warranted on the basis of newly discovered evidence, such evidence must be admissible in the new trial. *State v. Vess*, 2011-Ohio-3118, ¶ 38 (6th Dist.); *State v. Williams* 43 Ohio St.2d 88 (1975), at paragraph one of the syllabus (requiring that hearsay evidence meet one of the hearsay exceptions to allow it to support a motion for a new trial). Humphrey's statements are inadmissible hearsay, and Addison provides no exception that would allow Humphrey's statements into evidence. Furthermore, Addison did not demonstrate that he was unavoidably prevented from obtaining this information in a timely manner. Accordingly, the trial court did not abuse its discretion when the court denied Addison's motion for leave based on the affidavit of Pavish.

## Letter from Prosecutor

{¶ 35} Finally, Addison attached a letter from the prosecutor to the homicide detective, identifying a potential suspect that the prosecutor wanted investigated. Addison claims that this information was withheld from defense; however, Addison's claims are patently false. A review of the record reveals, that on February 15, 2007, the prosecutor described, on the record, the steps law enforcement were taking to interview the potential suspect that Addison — himself — identified to police and claimed was present the day of the murder with a 9 mm handgun. Hence, Addison has failed to demonstrate by clear and convincing evidence that the prosecution suppressed evidence. Accordingly, the trial court did not abuse its discretion when the court denied Addison's motion for leave based on the letter.

{¶ 36} In sum, we find that Addison failed to submit documents that "on their face" support Addison's claim that the State suppressed the evidence or that he was unavoidably prevented from timely discovering the grounds for his motion so as to entitle him to a hearing on his motion for leave. Therefore, the trial court did not abuse its discretion when it denied Addison's motion for leave without hearing.

{¶ 37} Accordingly, assignments of error one through six are overruled.

## The Trial Court's Recusal was Proper

{¶ 38} In Addison's seventh assignment of error, he alleges that it was error for the judge to recuse himself without stating his reasons citing Crim.R. 25(B).[3] The State contends there is no error because (1) Addison waived this argument because he did not object to the reassignment; (2) Crim.R. 25(B) does not apply because the judge was not the original trial judge; and (3) the appellate court is without authority to review a recusal. We agree with the State. "If a party does not object to the transfer of a case to a different judge, the party has failed to preserve the error and has waived the error for purposes of appellate review." *State v. Waltzer*, 2011-Ohio-5147, ¶ 9 (8th Dist.), citing *In re J.J.*, 2006-Ohio-5484, ¶16. Addison did not object below, therefore the argument is waived.

---

[3] Crim.R. 25(B) states: "[a]fter verdict or finding of guilt. If for any reason the judge before whom the defendant has been tried is unable to perform the duties of the court after a verdict or finding of guilt, another judge designated by the administrative judge, or, in the case of a single-judge division, by the Chief Justice of the Supreme Court of Ohio, may perform those duties. If such other judge is satisfied that he cannot perform those duties because he did not preside at the trial, he may in his discretion grant a new trial."

{¶ 39} Nevertheless, we note that a cursory review of the public docket reveals that the judge properly recused himself because his brother represented the codefendant during the time period that the brothers shared an office. The Ohio Code of Judicial Conduct 2.11(A) states that

> A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:
>
> . . .
>
> (7) The judge meets any of the following criteria:
>
> (a) The judge served as a lawyer in the matter in controversy or was associated with a lawyer who participated substantially as a lawyer in the matter during such association[.]

{¶ 40} Accordingly, Addison's seventh assignment of error is overruled.[4]

{¶ 41} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

---

[4] This court finds it troubling that Addison's counsel makes such unsubstantiated accusations against the prosecutor and the judge when minimal or cursory research would have revealed the claims to be blatantly false.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
EMANUELLA D. GROVES, J., CONCUR